**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 1:11-CR-00038** |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **BILLY LEE BANKS,** | : | |
| **TROY M. BISHOP, and** | : | |
| **TINA FLEISHER,** | : | |
| Defendants | : | |

**MEMORANDUM**

Presently pending before the Court is Defendant Billy Lee Banks's motion to suppress evidence that law enforcement officers seized from a vehicle during the course of a traffic stop. (Doc. No. 43.)  On September 1, 2011, the Court held a hearing on this motion.  For the reasons that follow, Banks's motion will be denied.

I.     **BACKGROUND**

On November 1, 2010, at approximately 11:07 a.m., Pennsylvania State Trooper Mark Gray observed a green Chevy Tahoe traveling eastbound in the left lane of travel on Pennsylvania State Route 76 at 85 miles per hour, in violation of the speed limit.  (Doc. No. 67 at 1; Doc. No. 68 at 4.)  Trooper Gray followed and observed the vehicle's rate of speed for a minimum of one mile before initiating a traffic stop by activating his vehicle's emergency lights at approximately 11:08 a.m.  (Doc. No. 67 at 1; Doc. No. 68 at 5.)  For about one minute, the vehicle continued traveling in the left lane, which prompted Trooper Gray to employ his vehicle's siren.  (Doc. No. 67 at 1; Doc. No. 68 at 8.)  About one minute later, the driver of the vehicle moved to the right lane of travel and then pulled over and stopped on the shoulder of the road.  (Doc. No. 68 at 8-9.)

1

Before approaching the vehicle, Trooper Gray noticed movement inside the vehicle.  (Id. at 10.)  Specifically, he noticed that the passenger seated in the front seat was looking back at him repeatedly.  (Id.)  At approximately 11:12 a.m., Trooper Gray approached the driver's window of the vehicle and spoke with the vehicle's occupants.  (Doc. No. 67 at 1.)  The driver, Defendant Tina Fleisher, presented a New Mexico identification card to Trooper Gray.  (Doc. No. 68 at 11.)  The vehicle's registered owner, Defendant Troy Bishop, who was seated in the left rear seat, also presented identification to Trooper Gray.  (Id.)  Banks, who was seated in the front passenger seat, informed Trooper Gray that he had lost his identification during their trip.  (Doc. No. 67 at 1-2.)  Fleisher then explained that they were traveling from New Mexico to New Jersey.  (Id. at 2.)

At approximately 11:14 a.m., Trooper Gray asked Banks for his name.  (Id.)  Banks identified himself as "Robert Lee Williams" and provided Trooper Gray with his alleged height, date of birth, and age, which Trooper Gray recorded in a notebook.  (Id.; Doc. No. 68 at 12.)  According to Trooper Gray, Banks paused for a significant length of time before stating his age, as if he were "trying to figure out how old he was."  (Doc. No. 68 at 12.)  Banks told Trooper Gray that he was born on November 4, 1981.  (Id.)  Trooper Gray then asked Banks to exit the vehicle and display his pockets.  (Doc. No. 67 at 2.)  Banks cooperated and reentered the vehicle after Trooper Gray found no identification on him.  (Id.)  Banks explained that he did not have a driver's license, but that he did have a New Jersey identification card.  (Id.)

After Banks reentered the vehicle, Trooper Gray asked Defendants questions concerning their trip.  (Id.)  They informed Trooper Gray that they had traveled from New Jersey to New Mexico, where they stayed for one-and-a-half to two days, visiting Fleisher's daughter, and were

now traveling back to New Jersey.  (Id.; Doc. No. 68 at 13.)  Trooper Gray testified that the

duration of this stay in New Mexico struck him as "unusual," that the vehicle had a "very, very

strong odor of . . . air deodorizer or air freshener," and that he noticed multiple cell phones and

two gas cans in the interior of the vehicle.  (Doc. No. 68 at 13-16.)  According to Trooper Gray,

after making these observations, he began to suspect "the possibility of criminal activity."  (Id.)

      At approximately 11:17 a.m., Trooper Gray returned to his vehicle and began to conduct

database searches on Defendants to determine whether they had valid identifications and whether

they were wanted by law enforcement in connection with any criminal activity.  (Doc. No. 67 at

2; Doc. No. 68 at 17.)  Within three minutes, he found that Fleisher's license had been

suspended.  (Doc. No. 67 at 2; Doc. No. 68 at 17.)  However, neither he nor his dispatcher, who

he contacted via radio, were able to verify any of the information that Banks provided despite

running Banks's alleged name and date of birth "geographically, regionally, [and across]

multiple states."  (Doc. No. 68 at 18-19.)

      At approximately 11:30 a.m., Trooper Luke Staniere arrived at the scene.  (Doc. Nos. 67

at 2; 68 at 21.)  Trooper Gray explained to Trooper Staniere that he had been unable to verify

Banks's identity.  (Doc. No. 67 at 2.)  Troopers Gray and Staniere then conducted another search

and found that no individual with Banks's alleged name and date of birth was wanted by law

enforcement in connection with any criminal activity.  (Id.)

      At approximately 11:37 a.m., Trooper Staniere approached the vehicle, asked Banks to

exit the vehicle, and conducted a brief pat-down of Banks's person.  (Id.)  After speaking with

Banks for about five minutes, Trooper Staniere returned to Trooper Gray's vehicle and told

Trooper Gray that the vehicle had a strong odor of air fresheners.  (Id.)  At about 11:47 a.m.,

Trooper Staniere approached Banks and spoke with him for about three minutes.  (Id. at 3.)
After returning to Trooper Gray's vehicle, Trooper Staniere told Trooper Gray that Banks
provided information regarding his education, which conflicted with the information he provided
to Trooper Gray regarding his age.  (Id.; Doc. No. 68 at 25.)  Thereafter, Troopers Gray and
Staniere conducted a database search, using the name "Robert Lee Williams" and the birth year
of 1980 instead of 1981.  (Doc. No. 67 at 3.)  This search produced a result, stating that a person
with that name and date of birth was armed and dangerous and may have a protection-from-
abuse ("PFA") order issued against him.  (Id.)  Trooper Gray then contacted his dispatcher to
verify this information; she indicated that the information was correct.  (Doc. No. 68 at 22-23.)

At approximately 12:05 p.m., Trooper Gray approached the vehicle and asked Fleisher to
exit the vehicle.  (Doc. No. 67 at 3.)  He issued her two citations for speeding and driving on a
suspended license.  (Id.)  At about 12:11 p.m., Trooper Gray asked Fleisher for her consent for
him to search the vehicle, so that he could locate identification for Banks and any illegal items.
(Id.)  Fleisher indicated that she did not object to the search, but that consent should be obtained
from Bishop since he owned the vehicle.  (Id.)  Trooper Gray then spoke to Bishop, explaining
that he would like to search the vehicle to locate any evidence verifying Banks's identity as well
as any illegal items, particularly weapons.  (Id.)  Specifically, Trooper Gray informed Bishop
that he may have to take Banks into custody if he could not verify Banks's identity because he
had discovered that a man named "Robert Lee Williams" was listed as armed and dangerous.
(Id.)

After giving verbal consent and reviewing a consent-to-search form with Trooper Gray,
Bishop signed the form at approximately 12:18 p.m.  (Id.)  Trooper Gray began his search of the

vehicle at about 12:21 p.m.  (Id.)  At about 12:33 p.m., Corporal Dan Housel, a corporal with the

Bureau of Emergency and Special Operations, approached the vehicle and spoke with Trooper

Gray.  (Doc. No. 67 at 3; Doc. No. 68 at 61.)  According to Corporal Housel, after Trooper Gray

relayed all relevant information to him:

> I went to [Bishop] and explained to him who I was, what my position
> was, and what I did and told him that I realize that you've already
> given consent to search the car, to which he agreed, I said, do you
> have an issue if I place a [police dog] into the car to continue the
> search, to which he had no issues with.  He said it was not a problem
> if I did that.

(Doc. No. 68 at 64.)  At about 1:04 p.m., Corporal Housel began to use a certified police dog

named Nemo to search the vehicle.  (Doc. No. 67 at 3.)  The canine search lasted about two-and-

a-half minutes.  (Id. at 4.)  According to Corporal House, Nemo worked his way to the front seat

area, tried to reach underneath the front seat, stuck his head down, tried to scratch underneath the

seat, and then pulled his paw out and sat.  (Doc. No. 68 at 65.)  This behavior, according to

Corporal Housel, indicated that Nemo had detected a particular odor.  (Id.)

At approximately 1:07 p.m., three troopers returned to the vehicle and entered the front

compartment.  (Doc. No. 67 at 4.)  They discovered a loaded handgun located underneath the

center of the front passenger seat in "a compartment that was manufactured."  (Doc. No. 68 at

29-30.)  They also discovered a gallon-size package of brown powder, later identified as heroin.

(Id. at 30.)  The troopers then walked to the side of the highway, where the occupants were

located and announced that they were under arrest.  (Doc. No. 67 at 4.)

On February 9, 2011, a grand jury returned a three-count indictment, charging Banks,

Fleisher, and Bishop with possession with intent to distribute 500 grams and more of heroin in

violation of 21 U.S.C. § 841; conspiracy to distribute heroin in violation of 21 U.S.C. § 846; and

possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. §

924(c).  (Doc. No. 1.)  On February 15, 2011, Banks pleaded not guilty to all offenses.  (Doc.

No. 14.)  Banks filed a motion to suppress all evidence seized from the vehicle during the

November 1, 2010 traffic stop (Doc. No. 43), and a brief in support (Doc. No. 44) on May 5,

2011.  The Government filed a brief in opposition on May 18, 2011.  (Doc. No. 47.)  The Court

held a hearing on Banks's motion on September 1, 2011.

## II.   DISCUSSION

In his motion, Banks seeks to suppress all evidence seized from Bishop's vehicle during

the November 1, 2010 traffic stop.  (Doc. No. 43 at 5.)  Banks first argues that, although the

initial stop was lawful, the officers did not have reasonable suspicion to extend the traffic stop

and, as a result, he was unlawfully seized in violation of the Fourth Amendment.  (Doc. No. 44 at

3-4.)  Moreover, Banks argues that, even if the officers had reasonable suspicion, the stop

violated the Fourth Amendment because it exceeded the time necessary for the officers to dispel

any suspicions.[1]  (Doc. No. 68 at 1.)  Accordingly, Bank contends that the contraband found in

the car should be suppressed as fruit of the poisonous tree.  (Id. at 5.)  In response, the

Government first argues that Banks lacks standing to challenge the search because he did not

have a reasonable expectation of privacy in the vehicle.  (Doc. No. 47 at 5.)  The Government

further argues that the officers had reasonable suspicion to extend the traffic stop.  (Id. at 8-10.)

The Court will address each issue in turn.

### A.   Standing

---

[1] This argument was not briefed but was raised by defense counsel at the hearing held on
September 1, 2011.  (Doc. No. 68 at 1.)

The Government argues that because Banks did not own the vehicle that was searched, and was only a passenger, he "ha[d] no reasonable expectation of privacy in the vehicle." (Doc. No. 47 at 5-6.)  As a result, the Government argues that Banks does not have standing to challenge the admission of the evidence seized from the vehicle.  (Id. at 6.)

The Government is correct that "passengers are generally held to lack 'standing' to object to evidence discovered in a search of a vehicle" because they do not have a reasonable expectation of privacy in a car they neither own nor control.  United States v. Mosley, 454 F.3d 249, 253-54 (3d Cir. 2006) (distinguishing claims by passengers challenging the illegal search of the vehicle from passengers challenging the illegal seizure of the vehicle and holding that the latter have standing).  Banks, however, challenges the legality of his seizure, contending that the officers did not have reasonable suspicion to extend the initial traffic stop and, therefore, all evidence obtained therefrom must be suppressed under the fruit of the poisonous tree doctrine. (Doc. No. 44 at 3-5.)

In Mosley, the United States Court of Appeals for the Third Circuit considered a closely related issue and stated that "it is settled law that a traffic stop is a seizure of everyone in the vehicle . . . [t]hus passengers of an illegally stopped vehicle have 'standing' to object to the stop."  454 F.3d at 253 (citing Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  The United States Supreme Court approved the Third Circuit's holding in Mosley.  See Brendlin v. California, 551 U.S. 249, 258 (2007) ("A traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver . . . .")  In Brendlin, the Supreme Court held that all passengers in a car stopped for a traffic violation are seized for Fourth Amendment purposes.  Id. at 255.  Because a passenger is seized during a traffic stop to the same extent a driver is, the

Supreme Court further ruled that passengers have standing to seek suppression of evidence obtained after an illegal seizure under the fruit of the poisonous tree doctrine.  Id. at 259-60, 263.

Accordingly, Banks has standing to object to the seizure of his person during the traffic stop and to seek suppression of evidence obtained as a result of the stop.

### B.        Reasonable Suspicion

Banks does not contend that the initial traffic stop was unlawful, but, rather, argues that the officers did not have reasonable suspicion to extend the traffic stop and detain Defendants for further investigation.  (Doc. No. 44 at 3.)  Banks further argues that, even if the officers did have reasonable suspicion, the stop exceeded the time necessary to dispel the officers' suspicions.[2] (Doc. No. 68 at 1.)  The Government counters that the officers had reasonable suspicion of criminal activity sufficient to justify expanding the scope of the initial stop.  (Doc. No. 47 at 9.)

A valid traffic stop becomes unreasonable when its scope exceeds the justification for its initiation.  Illinois v. Caballes, 543 U.S. 405, 408 (2005).  "An investigative detention must be temporary and last no longer than necessary to effectuate the purpose of the stop."  Florida v. Royer, 460 U.S. 491, 500 (1983).  Beyond that, the police may lawfully "escalate the encounter

---

[2] At the hearing held on September 1, 2011, defense counsel stated that Banks "would like to argue . . . that even if there [were] reasonable suspicion, that the search still was in violation of the Fourth Amendment because it exceeded the time necessary to dispel any suspicions.  Essentially the search was longer than it had to be. . . . The stop was too long."  (Doc. No. 68 at 1 (emphasis added).)  Defense counsel cited to United States v. Sharpe, 470 U.S. 675, 686 (1985), in support of this argument.  In light of the fact that passengers generally lack standing to challenge a search of a vehicle, the Court interprets Banks's argument as challenging the duration of the traffic stop and seizure of Banks's person and not that of the search of Bishop's vehicle.  See supra Section II. A; see also Brendlin, 551 U.S. at 258 (holding that, when a police officer makes a traffic stop, a passenger in the vehicle is seized for Fourth Amendment purposes and, therefore, may challenge the constitutionality of the stop, not the constitutionality of the search of the vehicle).

by visually inspecting the interior of the car and checking credentials and asking questions of the

occupants." Mosley, 454 F.3d at 252 (internal quotation marks omitted).  The Third Circuit has

further explained: "After a traffic stop that was justified at its inception, an officer who develops

reasonable, articulable suspicion of criminal activity may extend the scope of an inquiry beyond

the reason for the stop and detain the vehicle and its occupants for further investigation." United

States v. Givan, 320 F.3d 452, 458 (3d Cir. 2003).  "While 'reasonable suspicion' must be more

than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some

minimal, objective justification" for extending the scope of inquiries incident to a traffic stop.

Id.  In determining whether the officers acted lawfully, the Court "must consider the totality of

the circumstances, in light of the officers' experience" and accord "great deference to the

officer's knowledge of the nature and the nuances of the type of criminal activity that he had

observed in his experience, almost to the point of permitting it to be the focal point of the

analysis" Id.  Finally, in determining whether a detention is too long for an investigatory stop, it

is "appropriate to examine whether the police diligently pursued a means of investigation that

was likely to confirm or dispel their suspicions quickly, during which time it was necessary to

detain the defendant." Sharpe, 470 U.S. at 686.

      Banks argues that he was seized from the moment of the traffic stop without reasonable

suspicion or probable cause, and, therefore, all evidence seized from the vehicle must be

suppressed as fruit of the poisonous tree.[3]  (Doc. No. 44 at 5.)  Banks's argument, however,

ignores a number of observations made by Troopers Gray and Staniere over the course of the

---

[3] Banks also argues that all "contraband seized from his person" must be suppressed. (Doc. No. 44 at 5.)  The record, however, does not reflect that any contraband was seized from Banks's person.

stop that provided them with reasonable suspicion of criminal activity.  While asking Defendants

for identification, which was within the bounds of a normal traffic stop, Trooper Gray observed

multiple cell phones and gas cans in the vehicle and noticed an overwhelming odor of air

fresheners emanating from the vehicle.  When Banks failed to produce identification, Trooper

Gray asked him to exit the vehicle, display his pockets, and state his name and date of birth,

which was also within the scope of a normal traffic stop.  See Maryland v. Wilson, 519 U.S. 408,

414 (1997) ("[A]n officer making a traffic stop may order passengers to get out of the car

pending completion of the stop.").  Further, Trooper Gray learned from Defendants that they had

traveled from New Jersey to New Mexico, had stayed in New Mexico for about one-and-a-half

days, and were now traveling from New Mexico back to New Jersey.  Thus, during routine

questioning, Trooper Gray observed the strong odor of deodorizers and learned that Banks had

no identification and that Defendants had traveled across the country and back in a very brief

period of time.  These circumstances, in the context of Trooper Gray's experience with

individuals lying about their identities, gave Trooper Gray reasonable, articulable suspicion that

Banks may have provided an alias and false date of birth and may be involved in criminal

activity.  Trooper Gray and Staniere's further questioning of Banks regarding his identity was,

therefore, reasonable.

Based on Banks's inconsistent information regarding his age, Troopers Gray and Staniere

had good cause to run additional database searches for individuals with the name Banks

provided.  Upon discovering that an individual with the same name and birthday, but different

birth year, was listed as armed and dangerous and may have a PFA order issued against him,

Troopers Gray and Staniere had reasonable suspicion to investigate further.  In Terry v. Ohio,

392 U.S. 1, 27 (1968), the Supreme Court determined that a search can be justified if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Reasonably believing that Banks may be armed and dangerous, Trooper Gray requested the consent of Bishop to search the vehicle to which Bishop gave written consent.  Consent to a search is a "specifically established exception" to the warrant requirement.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  Based on the totality of circumstances, the Court concludes that, over the course of the valid traffic stop, the officers developed reasonable suspicion that supported extended detention and further investigation.

Finally, the record does not suggest that the officers did not "diligently pursue[] a means of investigation that was likely to confirm or dispel" their initial suspicions.  Sharpe, 470 U.S. at 686.  Trooper Gray began conducting a database search to verify the identities and criminal records of Defendants at approximately 11:17 a.m.  About forty-one minutes later, after he and Trooper Staniere ran multiple searches and spoke with Banks multiple times, they discovered that an individual with the same name and birthday was listed as armed and dangerous and may have a PFA order issued against him.  In the next twenty minutes, Trooper Gray issued two citations to Fleisher, had conversations with both Fleisher and Bishop, and requested and received consent to search the vehicle from Bishop.  In his brief, Banks does not specifically take issue with the length of time that Troopers Gray and Staniere spent attempting to verify his identity.  Even if he did, the significant time between Trooper Gray's initiation of the database searches and the discovery of an individual matching Banks's alleged name and birthday, hardly demonstrates an unreasonable delay on the officers' part, given the fact that Banks failed to produce any identification, provided a false name and date of birth, and provided contradictory

11

information regarding his age.

Banks's only specific argument regarding the duration of the stop is that the officers did not indicate that he, Fleisher, or Bishop were free to leave the scene after Trooper Gray issued the citations to Fleisher.  (Doc. No. 44 at 4.)  Banks appears to argue that, because the officers did not indicate that they were free to leave, an unlawful seizure occurred.  (Id.)  This argument lacks merit.  As discussed, during the course of the stop, the officers developed reasonable suspicion to believe that criminal activity was afoot and were justified in extending the detention to investigate further.  In addition, Trooper Gray obtained written consent from Bishop to search the vehicle within less than ten minutes after issuing and explaining the citations to Fleisher. Based on the totality of the circumstances, the Court concludes that no Fourth Amendment violation occurred.  Accordingly, Banks's motion to suppress is denied.

III.    **CONCLUSION**

For these reasons, the Court concludes that Banks has presented no basis for the suppression of the evidence seized during the search of the vehicle.  Accordingly, Banks's motion to suppress (Doc. No. 43) will be denied.  An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **Criminal No. 1:11-CR-00038** |
| **v.** | **:** | **(Chief Judge Kane)** |
| | **:** | |
| **BILLY LEE BANKS,** | **:** | |
| **TROY M. BISHOP, and** | **:** | |
| **TINA FLEISHER,** | **:** | |
| Defendants | **:** | |

<u>**ORDER**</u>

**NOW**, on this 25th day of October 2011, upon consideration of Defendant Billy Lee Banks's motion to suppress evidence (Doc. No. 43), **IT IS HEREBY ORDERED** that Defendant Banks's motion is **DENIED**.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania

13